**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Jacob Amrani, ) | 2:12-cv-2583 JWS |
|         Plaintiff, ) | ORDER AND OPINION |
|   vs. ) | [Re: Motion at Docket 97] |
| United States of America, ) | |
|         Defendant. ) | |

## I. MOTION PRESENTED

At docket 97 defendant United States of America ("United States") asks to exclude or limit the testimony and opinions of several of plaintiff Jacob Amrani's ("Dr. Amrani") experts. Dr. Amrani opposes at docket 109. United States replies at docket 119. Oral argument was requested but would not assist the court.

## II. BACKGROUND

Dr. Amrani is a board certified orthopedic surgeon who specialized in spine surgery. Dr. Amrani's practice in Phoenix was conducted at his own clinic, the Deer Valley Spine Center. Because he is a veteran, Dr. Amrani is eligible to receive his own medical care from the Veteran's Administration ("VA"). Some time after he suffered a

severe injury to his right should while weightlifting, Dr. Amrani sought treatment at the VA hospital in Phoenix.  Dr. Amrani was placed under the care of Dr. Cranford, a board certified orthopedic surgeon who performed right shoulder rotator cuff surgery on Dr. Amrani.  The surgery included excision of a soft tissue mass in the shoulder.  Dr. Amrani claims that, as a result of the medical negligence of Dr. Cranford, he has experienced a substantial loss of function in his right shoulder and right arm which has negatively affected his ability to practice surgery and thus reduced his income.  In this lawsuit Dr. Amrani seeks more than $6 million in damages.

Among others, Dr. Amrani has named Dr. Corrie Yablon ("Dr. Yablon"), Dr. Scott Nelson ("Dr. Nelson"), Dr. David Mohler ("Dr. Mohler"), and Alan Burke as expert witnesses.[1]  These witnesses' testimony and opinions are at issue in the motion at hand.

### IV.  DISCUSSION

**A.   Dr. Yablon**

Dr. Yablon is a board certified radiologist with a subspecialty in "Musculoskeletal (MSK) Imaging."[2]  Dr. Yablon has prepared an expert report regarding the MRI findings on Dr. Amrani's right shoulder and the subsequent care he received for the soft tissue mass found on his pre-operative MRI.[3]  The United States seeks to exclude Dr. Yablon as an expert witness or, alternatively, limit her testimony, because: (1) Dr. Yablon does not meet the criteria of A.R.S. § 12-2604; (2) Dr. Yablon's opinions regarding what may have happened if the mass had been malignant are irrelevant; (3) Dr. Yablon's testimony would be duplicative of Dr. Stephen Kay; and (4) Dr. Yablon is not competent to testify as to whether Dr. Amrani's axillary nerve was injured, how it was injured, or the cause of that injury.

---

[1] Doc. 97-5 at 8-9, 11, 13, 15.

[2] Doc. 97-3 at 2.

[3] *Id*.

**1.     Dr. Yablon may not testify regarding the appropriate standard of care**

In pertinent part A.R.S. § 12-2604 provides that if a party in a medical malpractice action against whom expert testimony on "the appropriate standard of practice or care" is offered "is or claims to be a specialist who is board certified, the expert witness shall be a specialist who is board certified in that specialty or claimed specialty."[4]  The Arizona legislature enacted this statute to ensure that "only physicians with comparable training and experience may provide expert testimony regarding whether the treating physician provided appropriate care."[5]

The parties agree that because Dr. Yablon is not a specialist in orthopaedic surgery, A.R.S. § 12-2604 forbids her from testifying regarding the standard of care applicable to Dr. Cranford.  The United States argues that Dr. Yablon opines on the appropriate standard of care, however, with her following three conclusions: (1) "it was standard operating procedure for an orthopedic surgeon to refer a mass such as [Dr. Amrani's] to an orthopedic oncologist for evaluation and treatment;" (2) "[i]t was a grave error on the part of the treating orthopedic surgeon to assume that the soft tissue mass was benign and that the etiology was secondary to the rotator cuff tear;" and (3) "[b]ecause the assumption was made that the mass was benign, it was not approached with the care that would be taken if the mass had been suspected to be malignant."[6]  Dr. Amrani argues that "Dr. Yablon is not providing a standard of care opinion against Dr. Cranford; she is providing a causation opinion that a radiologist would have recommended a referral to an orthopedic oncologist."[7]

A.R.S. § 12-2604 does not preclude Dr. Amrani from offering Dr. Yablon's testimony to show causation—that Dr. Cranford's breach of the appropriate standard of

---

[4] A.R.S. § 12-2604(A)(1).

[5] *Baker v. Univ. Physicians Healthcare*, 296 P.3d 42, 46 (Ariz. 2013).

[6] Doc. 119 at 3-4.

[7] Doc. 109 at 4.

care resulted in injury. Thus, Dr. Yablon may testify about how a radiologist may have prevented injuries caused by Dr. Cranford's alleged breach. The court agrees with the United States, however, that Dr. Yablon's report goes beyond this, and express her opinion of what a prudent orthopedic surgeon would have done under the circumstances. Such opinions, including the three opinions identified above, are inadmissible pursuant to A.R.S. § 12-2604. With regard to these opinions, the United States' motion is granted.

### 2. Dr. Yablon's opinion regarding what may have happened if the mass had been malignant is irrelevant

The United States argues that "Dr. Yablon's opinions as to what may have happened during surgery had the mass been malignant are irrelevant" because the mass was benign, an undisputed fact.[8] Specifically, the United States objects to Dr. Yablon's following three opinions: (1) that "it was not possible, based on the limited imaging pre-operatively, to know that the right shoulder mass was benign;"[9] (2) "a core needle biopsy should have been performed prior to resection of the tumor so that appropriate pre-operative planning could be performed;"[10] and (3) Dr. Cranford erred by removing the mass without first consulting with the radiologist or an orthopedic oncologist "as to the proper approach and the important anatomic structures to avoid."[11] Dr. Amrani responds by arguing that the United States is missing the point of Dr. Yablon's testimony—her testimony is not being offered to show whether the mass was benign or malignant, but rather, whether his axillary nerve would have been injured if Dr. Cranford had not breached the appropriate standard of care.

---

[8]Doc. 97 at 9.

[9]Doc. 97-3 at 11.

[10]*Id*.

[11]*Id*. at 12.

The United States is correct that Dr. Yablon's opinion about how Dr. Amrani would have been treated if a core needle biopsy had yielded a malignant result is irrelevant to this case.[12] But the specific opinions to which the United States objects do not pertain to what might have happened if the mass were malignant. Instead, Dr. Yablon states what might have happened if Dr. Cranford had *suspected* that the mass was malignant. Although Dr. Yablon may not testify whether Dr. Cranford breached his standard of care by not suspecting as much, Dr. Yablon's testimony about how consultation with a radiologist might have prevented Dr. Amrani's injury would go to causation, and would therefore be relevant.

### 3. Dr. Yablon's testimony would not be duplicative of Dr. Kay's

The United States argues that Dr. Yablon should be excluded as an expert witness because her testimony would be duplicative of Dr. Kay's. The premise of this argument is that Dr. Yablon would be merely offering her opinion on whether Dr. Cranford breached the appropriate standard of care. This premise is faulty. Dr. Yablon will not be permitted to offer standard of care testimony, so her testimony is not duplicative.

### 4. Dr. Yablon's qualification to testify regarding the alleged nerve injury and anterior deltoid muscle atrophy

Dr. Yablon's expert report concludes that Dr. Amrani "suffered axillary nerve injury, which caused atrophy of his anterior deltoid muscle."[13] The United States objects to this opinion as unreliable, because nothing in Dr. Yablon's curriculum vitae establishes her competency to testify as to whether the axillary nerve was injured, how the nerve may have been injured, or what caused the alleged atrophy of Dr. Amrani's anterior deltoid muscle. The United States' argument does not reference Rule 702 of the Federal Rules of Evidence, but this is the authority upon which it relies. Rule 702

---

[12]Doc. 97-3 at 11 ("If the core specimens yielded a malignant result, then appropriate pre-treatment discussion and planning with the patient could have ensued.").

[13]Doc. 97-3 at 12.

permits opinion testimony by an expert as long as the witness is qualified and the witness's opinion is relevant and reliable.[14] Expert opinion testimony is relevant "if the knowledge underlying it has a valid connection to the pertinent inquiry" and it is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."[15] Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[16] and its' progeny, "a district court's inquiry into admissibility is a flexible one."[17] The purpose of the district court's inquiry is not to "exclude opinions merely because they are impeachable," but rather to "screen the jury from unreliable nonsense opinions."[18]

In opposition, Dr. Amrani argues that Dr. Yablon is qualified to testify regarding whether and how the axillary nerve was injured because "she can show on the pre-operative MRI that the 'normal expected course of the axillary nerve is interrupted by the mass, as the mass appears to encase the axillary nerve.'"[19] Interpreting a pre-operative MRI is within a radiologist's qualifications. Dr. Yablon's testimony regarding her interpretation of the pre-operative MRI will therefore be helpful to the trier of fact. Dr. Amrani does not, however, explain how Dr. Yablon is qualified to testify that the nerve injury caused the alleged atrophy of Dr. Amrani's anterior deltoid muscle. Dr. Yablon is precluded from offering such testimony at trial.

---

[14]*See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014), *cert. denied sub nom. SQM N. Am. Corp. v. City of Pomona, Cal.*, No. 14-297, 2014 WL 4542540 (U.S. Dec. 15, 2014).

[15]*Id.* at 1044 (citation and internal quotation marks omitted).

[16]509 U.S. 579 (1993).

[17]*Pomona*, 750 F.3d at 1043.

[18]*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

[19]Doc. 109 at 5 (quoting Doc. 97-3 at 6).

**B.     Dr. Nelson**

Dr. Nelson is a board certified pathologist.[20] According to Dr. Amrani, Dr. Nelson will testify that a reasonable and prudent pathologist could have examined a needle biopsy specimen and reported his findings to the orthopedic surgeon, the radiologist, and an orthopedic surgical oncologist.[21] The United States seeks to exclude Dr. Nelson as an expert witness or, alternatively, limit his testimony, because: (1) Dr. Nelson does not meet the criteria of A.R.S. § 12-2604; (2) Dr. Nelson's testimony would be duplicative of Dr. Kay; and (3) Dr. Nelson is not competent to testify that a branch of Dr. Amrani's axillary nerve was cut.

**1.     Dr. Nelson may not testify regarding the appropriate standard of care**

As with Dr. Yablon, the parties agree that because Dr. Nelson is not a specialist in orthopaedic surgery, A.R.S. § 12-2604 forbids him from testifying regarding the standard of care applicable to Dr. Cranford. Dr. Amrani asserts that Dr. Nelson will not testify as to Dr. Cranford's standard of care, but rather, whether Dr. Amrani's axillary nerve was severed, whether Dr. Amrani's treatment required a multidisciplinary approach, and whether such a multidisciplinary approach could have prevented Dr. Amrani's injury.

As the United States points out, Dr. Nelson's report explicitly states that it contains his opinions regarding the manner in which Dr. Cranford "failed to meet the applicable standard[] of care."[22] Dr. Nelson states that "the plan for the surgery and the surgery performed by Dr. Cranford . . . falls well below the standard of care."[23] And Dr. Nelson concludes his report by stating that "if Dr. Cranford . . . had followed the principles of orthopedic oncology, and treated this patient and the tumor with the care

---

[20]Doc. 97-5 at 11.

[21]Doc. 109 at 2.

[22]Doc. 97-6 at 3. *See also* Doc. 97-6 at 6.

[23]Doc. 97-6 at 8.

and careful consideration deserved," Dr. Amrani would have been able to continue his career to completion.[24] These opinions of what a prudent orthopedic surgeon would have done under the circumstances, including whether Dr. Cranford should have consulted with a multidisciplinary team of physicians, are inadmissible pursuant to A.R.S. § 12-2604. However, Dr. Nelson may offer his opinion regarding whether and how Dr. Cranford's failure to consult with a pathologist or a multidisciplinary team of physicians prior to surgery may have caused Dr. Amrani's injury.

### 2. Dr. Nelson's testimony would not be duplicative of Dr. Kay's

The United States argues that Dr. Nelson should be excluded as an expert witness because his testimony would be duplicative of Dr. Kay's. The premise of this argument is that Dr. Nelson would be merely offering his opinion on whether Dr. Cranford breached the appropriate standard of care. Because this premise is faulty, it provides no basis for excluding Dr. Nelson's opinion relating to causation.

### 3. Dr. Nelson's qualification to testify regarding the alleged nerve injury

Dr. Nelson's expert report states that a branch of Dr. Amrani's axillary nerve was "severed during surgery, as evidenced by the immediate, long standing and likely permanent loss of motor function of the deltoid muscle, and the microscopic presence of nerves in the pathology specimen removed during surgery."[25] The United States concedes that Dr. Nelson is qualified to testify that the presence of nerves in the pathology specimen is evidence of axillary nerve damage, but argues that Dr. Nelson is not qualified to testify that Dr. Amrani's loss of motor function in his deltoid muscle is additional evidence of this fact. The court agrees that Dr. Amrani has not sufficiently explained how Dr. Nelson is qualified to draw this conclusion. Dr. Nelson is therefore prohibited from testifying that Dr. Amrani's loss of motor function in his deltoid muscle is evidence of axillary nerve damage.

---

[24]Doc. 97-6 at 9.

[25]Doc. 97-6 at 6.

**C. Dr. Mohler**

Dr. Mohler is a board certified orthopedic surgeon.[26] According to Dr. Amrani, Dr. Mohler will testify as to "what a reasonable and prudent orthopedic oncologist would have done had one been consulted, and how that consult would have changed plaintiff's outcome."[27] The United States seeks to exclude Dr. Mohler as an expert witness or, alternatively, limit his testimony, because: (1) what a reasonable orthopedic oncologist would have done is irrelevant to this case; and (2) Dr. Mohler does not meet the criteria of A.R.S. § 12-2604(A)(2).

### 1. What a reasonable orthopedic oncologist would have done may be relevant causation evidence

Dr. Mohler's expert report states that if Dr. Armani had been referred to an orthopedic surgical oncologist for evaluation of the tumor, "it is more likely than not the loss of axillary nerve function would have been avoided."[28] This is because, among other reasons, prior to removal an orthopedic surgical oncologist would have mapped out the location of "the abnormal tissue as it relates to the axillary nerve and its major branches."[29] Assuming that Dr. Amrani can establish that Dr. Cranford breached the appropriate standard of care, Dr. Mohler's testimony regarding how a referral to an orthopedic oncologist might have prevented Dr. Amrani's injury would go to causation, and would therefore be relevant.

### 2. Dr. Mohler will not offer standard of care testimony

The United States argues that Dr. Mohler should be excluded as an expert witness because he does not meet the criteria of A.R.S. § 12-2604(A)(2). In response, Dr. Amrani does not argue that Dr. Mohler is qualified to offer standard of care

---

[26]Doc. 97-5 at 8.

[27]Doc. 109 at 7.

[28]Doc. 97-7 at 3.

[29]Doc. 97-7 at 3.

testimony and represents that Dr. Mohler will not be called to do so.[30] A.R.S. § 12-2604 does not preclude Dr. Mohler from offering the causation testimony described above. But Dr. Mohler is precluded by A.R.S. § 12-2604 from testifying regarding his opinion of what a prudent orthopedic surgeon would have done under the circumstances.

**D.    Alan Burke**

Dr. Amrani intends to call Alan Burke, President of Insurance Reimbursement Specialists LLC,[31] to testify about Dr. Amrani's damages caused by the surgery. The United States objects to his testimony under Rule 702 and *Daubert*, arguing that it is based on unsupported speculation and subjective beliefs instead of scientific, technical, or other specialized knowledge. Specifically, the United States asserts that Mr. Burke is not qualified to testify "as to the revenue trends of a medical practice or to identify the single cause of variations in the amount of income."[32] Dr. Amrani responds by noting that Mr. Burke has experience with the "business of medical practices in general, and of plaintiff's medical practice in particular," including providing "billing and practice management services to physicians for 23 years," "conduct[ing] plaintiff's business electronic payor billing and collection responsibilities, and provid[ing] plaintiff with financial and practice analysis."[33]

Mr. Burke's expert report does not describe his educational background in any way. Also, it is not immediately apparent why his experience qualifies him as an expert on the causes of fluctuations in a surgeon's income. Dr. Amrani has not established that Mr. Burke's testimony will be helpful to the trier of fact. Mr. Burke will not be allowed to offer opinion testimony under Rule 702.

---

[30]Doc. 109 at 8.

[31]Doc. 97-8 at 2.

[32]Doc. 97 at 13.

[33]Doc. 109 at 16.

## V.  CONCLUSION

For the reasons above, the motion at docket 97 is GRANTED IN PART and DENIED IN PART as follows:

- Dr. Yablon may offer expert testimony, which may include her interpretation of Dr. Amrani's pre-operative MRI.  Dr. Yablon may not testify on the appropriate standard of care, how Dr. Amrani would have been treated if a core needle biopsy had yielded a malignant result, or whether Dr. Amrani's alleged axillary nerve injury caused atrophy of his anterior deltoid muscle.
- Dr. Nelson may offer expert testimony, including whether and how consultation with a pathologist or a multidisciplinary team of physicians might have prevented Dr. Amrani's injury.  Dr. Nelson may not testify on the appropriate standard of care or whether Dr. Amrani's alleged loss of motor function in his deltoid muscle is evidence of axillary nerve damage.
- Dr. Mohler may offer expert testimony, which may include whether and how consultation with an orthopedic surgical oncologist might have prevented Dr. Amrani's injury.  Dr. Mohler may not testify on the appropriate standard of care.
- Mr. Burke may not offer expert testimony.

DATED this 6th day of January 2015.

/s/ JOHN W. SEDWICK
SENIOR UNITED STATES DISTRICT JUDGE
